IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

LORRAINE J. RUSH           )
                           )
v.                         )      No. 2:06-0048
                           )      Judge Nixon/Bryant
SOCIAL SECURITY ADMINISTRATION    )


To:  The Honorable John T. Nixon, Senior Judge


## REPORT AND RECOMMENDATION

        This is a civil action filed pursuant to 42 U.S.C. §

405(g), to obtain judicial review of the final decision of the

Commissioner of Social Security denying plaintiff disability

insurance benefits ("DIB") and supplemental security income

("SSI"), as provided under Titles II and XVI of the Social

Security Act ("the Act"), as amended.  The case is currently

pending on plaintiff's motion for judgment on the administrative

record (Docket Entry No. 18), to which defendant has responded

(Docket Entry No. 21).  Upon consideration of these papers and

the transcript of the administrative record, and for the reasons

given below, the undersigned recommends that plaintiff's motion

be GRANTED, and that the decision of the Commissioner be REVERSED

and the cause REMANDED for further administrative proceedings

consistent with this report, to include rehearing.

1

# I. INTRODUCTION

Plaintiff filed her current DIB application on September 25, 2003, and protectively filed her current SSI application on August 26, 2003, alleged disability due to "fibromyalgia, back, hip, thigh, knees, carpal tunnel, tendonitis, neck pain, and fatigue" (Tr. 73, 82). These applications were denied at both the initial and reconsideration stages of administrative review (Tr. 45-48). Plaintiff thereafter requested and received *de novo* consideration by an Administrative Law Judge (ALJ), who heard the case on August 17, 2005, when plaintiff appeared with counsel and gave testimony, as did an impartial vocational expert (VE) (Tr. 302-22). After receiving this testimony, the ALJ took the case under advisement until January 19, 2006, when he issued a written decision denying plaintiff's benefits applications upon a finding that she did not meet the requirements for disability under the Social Security Act. (Tr. 13-22) The decision contains the following enumerated findings:

1.  The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through December 31, 2005.

2.  The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3.  The claimant's obesity, restless leg syndrome, fibromyalgia, lumbar spine and thoracic spine degenerative disc disease, and depressive disorder NOS (not otherwise specified) are considered "severe" based

2

on the requirements in the Regulations 20 CFR §§ 404.1520(c) and 416.920(c).

4.    These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4. She has no more than mild to moderate restrictions of activities of daily living or more than mild to moderate limitation of ability to maintain social functioning or to sustain concentration, persistence, or pace. She has experienced no episodes of decompensation, and she functions adequately outside of a highly supportive setting.

5.    The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

6.    The claimant has the following residual functional capacity: to perform light work provided she is not exposed to excessive vibration, performs no frequent bending, stooping, overhead motions, or squatting; and has no frequent contact with the public.

7.    The claimant is unable to perform any of her past relevant work (20 CFR §§ 404.1565 and 416.965).

8.    The claimant is a "younger individual between the ages of 45 and 49" (20 CFR §§ 404.1563 and 416.963).

9.    The claimant has a "high school (or high school equivalent) education" (20 CFR §§ 404.1564 and 416.964).

10.   The claimant has no transferable skills from any past relevant work (20 CFR §§ 404.1568 and 416.968).

11.   The claimant has the residual functional capacity to perform a significant range of light work (20 CFR §§ 404.1567 and 416.967).

12.   Although the claimant's exertional limitations do not allow her to perform the full range of light work, using Medical-Vocational Rule 202.21 as a framework for decision-making, there are a significant number of jobs in the national economy that she could perform. Examples of such jobs include work as a mail clerk, office helper, photo copier, addresser, table worker,

3

and assembler, with 11,255 jobs in the local economy, and 461,716 jobs in the national economy.

13. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR §§ 404.1520(g) and 416.920(g)).

(Tr. 20-21)

On April 3, 2006, the Appeals Council denied plaintiff's request for review of the decision of the ALJ (Tr. 5-8), thereby rendering that decision the final decision of the Commissioner. This civil action was thereafter timely filed, and the Court has jurisdiction. 42 U.S.C. § 405(g). If the Commissioner's findings are supported by substantial evidence, based on the record as a whole, then these findings are conclusive. Id.

## II. REVIEW OF THE RECORD[1]

### A. Medical Evidence

### 1. Records From or Tests Ordered by Dr. Buchanan

X-rays of the thoracic spine taken on April 26, 2002 showed minimal lower thoracic degenerative spondylosis at T11-12, with normal disc spaces, alignment, and vertebral body heights (Tr. 234). X-rays of the lumbar spine taken on that date showed

---

[1]Inasmuch as plaintiff did not endeavor to summarize the record in this case, the following summary is taken in large measure from defendant's brief (Docket Entry No. 21 at 2-10), with more detailed discussion of the evidence relevant to the particular arguments advanced to follow in the conclusions section of this report.

4

probable mild degenerative disc disease at L5 with minimal degenerative spondylosis (Tr. 234). X-rays of the right knee taken on that date were normal (Tr. 234).

Plaintiff saw Ernest G. Buchanan, M.D., her treating physician, on December 18, 2002, complaining of worsening back pain with some radicular symptoms (Tr. 232). An MRI of the lumbar spine performed on December 20, 2002, revealed little change since a previous MRI performed in 1998 (Tr. 231). The 2002 MRI revealed only mild degenerative spondylosis, adequate space for the dural sac and neuroforaminal openings at all levels of the lumbar spine, and a slight moderately prominent spur at the T11-12 disc level (Tr. 231).

Dr. Buchanan wrote a letter dated February 27, 2003, stating that plaintiff had an abnormal MRI and "a long history of severe cervical spine disease," so needed to see a neurosurgeon (Tr. 230). Plaintiff saw Dr. Buchanan on August 20, 2003, complaining primarily of "some urine leakage," (which Dr. Buchanan described as "intermittent") and saying that she wanted to resume medication for it (Tr. 229). "Otherwise, she is doing well," Dr. Buchanan commented (Tr. 229).

On September 30, 2003, plaintiff saw Dr. Buchanan after she had been hit or "clipped" by a grocery cart, causing lower back and right sciatic nerve pain (Tr. 227). x-rays taken on that date showed some moderate degenerative disc and degenerative

5

arthritis changes at L5-S1 and T11-12 levels, but no trauma (Tr. 226, 240).

On November 18, 2003, plaintiff underwent an MRI of the lumbar spine, which revealed a mild disc bulge at T11-12 and bone spurring, a mild disc bulge at L3-4 with a small central disc protrusion, and a mild disc bulge at L5-S1 with facet hypertrophy and mild neural foraminal narrowing (Tr. 223). On December 29, 2003, plaintiff complained to Dr. Buchanan of intermittent chest pain, saying that she had been told that she had a heart murmur (Tr. 203). Dr. Buchanan ordered an echocardiogram, which revealed that her systolic functioning was within the lower limits of normal (Tr. 202). Plaintiff next saw Dr. Buchanan on April 4, 2004, and was diagnosed with bronchitis (Tr. 296).

There are no further records of plaintiff seeing Dr. Buchanan until a year later, when she appeared for her annual physical examination, complaining only of intermittent pain in her lower left abdomen and of a lesion on her leg (Tr. 295). A CT scan of the abdomen and pelvis performed pursuant to plaintiff's complaints was normal (Tr. 293). Plaintiff next saw Dr. Buchanan in July 2005 because of an ear infection (Tr. 294).

On August 12, 2005, Dr. Buchanan completed parts of a fibromyalgia RFC questionnaire. On that form he indicated that he did not know whether plaintiff met the American College of Rheumatology's criteria for fibromyalgia (Tr. 297). He stated

6

that he did not know the location of the pain, and yet indicated that it was "frequent and severe" (Tr. 297). He indicated that movement and overuse precipitated the pain, and that plaintiff's pain was constantly severe enough to interfere with the attention and concentration necessary to do even simple work tasks (Tr. 298). He also indicated that plaintiff was incapable of performing even low stress jobs (Tr. 298).

Dr. Buchanan indicated that he did not know any of the answers to the questions about plaintiff's functional limitations, but that she needed to be able to change positions at will (Tr. 299). He indicated that she did not need to use a cane and did not need to elevate her leg while sitting (Tr. 299). Dr. Buchanan stated that plaintiff would need to walk around during the work day, but did not know how often or how long she would need to walk (Tr. 299). Similarly, he stated that she would have to take unscheduled breaks during the work day, but did not know how often, how long, or whether she would have to sit or lie down on such breaks (Tr. 299).

Dr. Buchanan did not know how much weight plaintiff could lift, or whether she could perform common postural activities (Tr. 300). He indicated that she had significant limitations with reaching, handling or fingering, but did not respond to the portion of the form that asked for more details about such limitations (Tr. 300). He indicated that she would

7

likely experience "good days" and "bad days," but could not estimate how many times she was likely to be absent per month as a result of her impairments (Tr. 300). In response to the question about the earliest date the description of the symptoms and limitations on the form applied, Dr. Buchanan responded, "ask patient prob. 4/9/04" (Tr. 300).

## 2. Records from Dr. Chung

On May 15, 2003, Stephen S. Chung, M.D. conducted a neurologic evaluation. On that date, plaintiff was in no acute distress (Tr. 154). Her mood was dysthymic and her affect was flat, but judgment, insight, and comprehension were intact (Tr. 154). Physically, plaintiff had tenderness in the paraspinal muscles, especially in the lumbar area, and minimally in the thoracic area (Tr. 154). Dr. Chung also detected severe tenderness in the bilateral hips and moderate tenderness in the bilateral deltoid and trapezius areas (Tr. 155).

Dr. Chung noted that plaintiff had difficulty raising her heel because of pain and that her tandem gait was slow and cautious because of back pain, but all other neurological tests were normal (Tr. 155). Dr. Chung ordered a medication change from Lexapro to Paxil, prescribed Neurontin for restless leg syndrome and ordered additional tests for depression, headache, presenile dementia and chronic fatigue (Tr. 155).

Two months later, on July 21, 2003, plaintiff again saw

8

Dr. Chung, this time noting that Neurontin helped with the restless leg syndrome and that Paxil helped a little with her depression (Tr. 149). She still complained of diffuse pain from fibromyalgia (Tr. 149). Again, the neurological examination was normal, as were all the laboratory test results (Tr. 149, 150). Dr. Chung made some more medication adjustments for restless leg syndrome and increased her Paxil dosage, with instructions to return in four months (Tr. 150).

Plaintiff returned to Dr. Chung in January 2005, reporting that the increased dosage of Neurontin resulted in minimal restless leg symptoms (Tr. 281). Nevertheless, she complained of interrupted sleep, daytime sleepiness, and diffuse muscle pain, particularly in her right shoulder and arm (Tr. 281). Upon examination, Dr. Chung noted that plaintiff was extremely tender over the right deltoid, trapezius, and cervical paraspinal muscle on the right side, and was moving very slowly because of diffuse muscle pain (Tr. 282). Her gait was stable (Tr. 282).

### 3. Records from Dr. Kanagasegar

Plaintiff saw rheumatologist Sivalingam Kanagasegar, M.D., for a consultation on September 24, 2003. Upon examination that day, plaintiff was not in any distress (Tr. 159). Neck, shoulder, elbow, and wrist movements were all normal (Tr. 159). She had mild tenderness over the lumbar region (Tr.

9

159).  Bilateral straight leg raising test was negative to about 80 degrees (Tr. 159).  Muscle strength in the arms and legs was 5/5 with no evidence of peripheral neuropathy (Tr. 159).  Diffuse soft tissue fibromyalgia tender points were present (Tr. 159).  Plaintiff alleged pain at a level five out of ten that day (Tr. 159).

### 4.  Records from Dr. Ong

Cardiologist Samuel Ong, M.D., reported that plaintiff had undergone a normal stress test with no significant ischemia on February 24, 2004 (Tr. 201).  Plaintiff reported no chest pain during the test, and a pharmacologenic EKG was nondiagnostic (Tr. 201).  Plaintiff had a low normal LV systolic function, with LVEF calculated at 50 percent (Tr. 201).  When plaintiff saw Dr. Ong on March 2, 2004, with complaints of chest pain lasting from seconds to minutes, she also noted "occasional fatigue" and intermittent shortness of breath, with shortness of breath on exertion (Tr. 197).  Upon examination, plaintiff appeared to be in no acute distress, and there were no significant findings (Tr. 198).  Dr. Ong recommended several lifestyle changes, including smoking cessation, weight loss, dietary changes, aerobic exercise, and prescribed aspirin and Diovan for reduction of systolic function (Tr. 198).

When Dr. Ong saw plaintiff again in June 2004, he noted that plaintiff did not complain of dizziness or shortness of

breath and did not appear to be in any acute distress (Tr. 284).
Plaintiff mentioned that when she tried to stop her Neurontin,
her arms hurt so much that she could barely raise them (Tr. 284).
Dr. Ong concluded that plaintiff's chest pain did not appear to
be cardiac in nature, and again recommended the same lifestyle
changes that he had suggested previously (Tr. 285).

Six months later, plaintiff told Dr. Ong that
Paroxetine made her feel better and have fewer crying episodes
(Tr. 286). She complained that day of some pain at the left side
of her face near the jaw (Tr. 286). Again, a physical
examination was normal, and she appeared to be in no acute
distress (Tr. 286).

5. <u>Other Medical Records</u>

Mark Loftis, M.A., SPE, conducted a psychological
evaluation  on December 23, 2003. Plaintiff's fine and gross
motor skills, as well as her gait and posture, were within normal
limits (Tr. 161). She told Mr. Loftis that she had a pinched
nerve, that she "has all these different medical problems and she
cannot really get any kind of relief" to the point where some
days are so bad she cannot even get out of bed (Tr. 163). She
reported that she rarely leaves her home and that she had a long
history of depression with anger and crying spells (Tr. 163,
164). Upon examination, plaintiff demonstrated reasonable
ability to understand questions, had adequate recall, and

11

estimated average ability to sustain concentration and persist on task (Tr. 164). She had appropriate ability to interact with others and fair ability to adjust to changes in the workplace (Tr. 164). Mr. Loftis rated her overall limitations in the mild to moderate range (Tr. 164).

Joseph Johnson, M.D., performed a consultative examination on January 7, 2004. At that time, plaintiff appeared weary, and stood for half of the interview because of low back pain (Tr. 168). She had limited range of motion in the neck, shoulder, back and hips, and her gait was slightly slow because of right buttock pain (Tr. 169). She could not walk on her heels, but could walk on her toes and do tandem gait (Tr. 169). She had numerous trigger points (Tr. 169). Dr. Johnson estimated that plaintiff could sit for five hours out of eight with breaks to change position, could stand or walk for two hours out of eight, frequently lift 10 pounds, occasionally lift 20 pounds, and infrequently bend and stoop (Tr. 170).

Rebecca Hansmann, a state agency medical consultant, completed a mental residual functional capacity (RFC) form, indicating that plaintiff was moderately limited in the ability to understand, remember, and carry out detailed instructions (Tr. 172). She opined that plaintiff was moderately limited in the ability to maintain attention and concentration for extended periods, and moderately limited in the ability to work in

12

coordination with or proximity to others without being distracted by them (Tr. 172). Dr. Hansmann also opined that plaintiff was moderately limited in the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms, and in the ability to interact appropriately with the general public (Tr. 173). Further, she opined that plaintiff was moderately limited in the ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes (Tr. 173). Finally, she opined that plaintiff was moderately limited in the ability to respond appropriately to changes in the work setting (Tr. 173). In all other categories, plaintiff was not significantly limited (Tr. 172-73).

Dr. Hansmann concluded that plaintiff could understand, remember, and concentrate and persist for simple and low-level detailed tasks, despite periods of increased symptoms (Tr. 174). Dr. Hansmann estimated that plaintiff would experience some, but not substantial, difficulty interacting with the general public and co-workers, and that she could adapt to infrequent change (Tr. 174).

Also on January 15, 2004, Dr. Hansmann completed a psychiatric review technique form (PRTF). She opined that plaintiff had mild restriction in activities of daily living, mild difficulty in maintaining social functioning, mild difficulty in maintaining concentration, persistence, or pace,

13

and had not had any episodes of decompensation (Tr. 185).

State agency medical consultant K. Shannon Tilley, M.D., completed a physical RFC form on January 25, 2004, opining that plaintiff could occasionally lift and carry 20 pounds, frequently lift and carry 10 pounds, and could sit, stand and/or walk for 6 hours out of 8 (Tr. 190). Plaintiff's ability to push and pull was unlimited, and she could occasionally climb ladders, ropes, and scaffolds (Tr. 191). Dr. Tilley listed the evidence of record which supported her findings (Tr. 191-92). Plaintiff could perform on a frequent basis all other postural activities listed (Tr. 191). Plaintiff had no manipulative, visual, or communicative limitations (Tr. 192-93). Dr. Tilley found that plaintiff should avoid concentrated exposure to extreme cold, but that she had no other environmental limitations (Tr. 193).

State agency medical consultant James N. Moore, M.D., completed a physical RFC form on April 9, 2004, opining, as Dr. Tilley had, that plaintiff could occasionally lift and carry 20 pounds, frequently lift and carry 10 pounds, and could sit, stand and/or walk for 6 hours out of 8 (Tr. 268). Plaintiff's ability to push and pull was unlimited, and she could occasionally climb ladders, ropes, and scaffolds (Tr. 269). Dr. Moore determined, as Dr. Tilley had, that plaintiff could perform on a frequent basis all other postural activities listed (Tr. 269). Plaintiff had no manipulative, visual, or communicative limitations (Tr.

14

269-70). Dr. Moore also found that plaintiff should avoid concentrated exposure to extreme cold, but that she had no other environmental limitations (Tr. 270). Dr. Moore cited the evidence of record supporting his opinions (Tr. 272). Dr. Moore also specifically noted that he considered plaintiff's partially credible allegations of pain and fatigue, and that they did not further reduce the RFC (Tr. 272).

### III. CONCLUSIONS OF LAW

#### A. <u>Standard of Review</u>

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. <u>Jones v. Sec'y of Health & Human Servs.</u>, 945 F.2d 1365, 1369 (6th Cir. 1991). The purpose of this review is to determine (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. <u>Landsaw v. Sec'y of Health & Human Servs.</u>, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." <u>Her v. Comm'r of Soc. Sec.</u>, 203 F.3d 388, 389 (6th Cir. 1999)(<u>citing</u> <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971)). It has been further quantified as "more than a mere

15

scintilla of evidence, but less than a preponderance." <u>Bell v.</u> <u>Comm'r of Soc. Sec.</u>, 105 F.3d 244, 245 (6th Cir. 1996).  Even if the evidence could also support a different conclusion, the decision of the ALJ must stand if substantial evidence supports the conclusion reached.  <u>Her</u>, 203 F.3d at 389 (<u>citing</u> <u>Key v.</u> <u>Callahan</u>, 109 F.3d 270, 273 (6th Cir. 1997)).  However, if the record was not considered as a whole, the Commissioner's conclusion is undermined.  <u>Hurst v. Sec'y of Health & Human</u> <u>Servs.</u>, 753 F.2d 517, 519 (6th Cir. 1985).

B.  <u>Proceedings at the Administrative Level</u>

The claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process, as follows:

(1)  If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.
(2)  If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.
(3)  If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of

16

the "listed" impairments[2] or its equivalent; if a listing is met or equaled, benefits are owing without further inquiry.

(4)  If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (e.g., what the claimant can still do despite his or her limitations); by showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a prima facie case of disability.

(5)  Once the claimant establishes a prima facie case of disability, it becomes the Commissioner's burden to establish the claimant's ability to work by proving the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

Moon v. Sullivan, 923 F.2d 1175, 1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the evaluation process can be carried by relying on the medical-vocational guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule.  Otherwise, the grid can not be used to direct a conclusion, but only as a guide to the disability determination. Id.  In such cases where the grids do not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's prima facie case by coming forward with particularized proof of the claimant's individual vocational qualifications to

---

[2]The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, Appendix 1.

17

perform specific jobs, which is typically obtained through vocational expert (VE) testimony. See Varley v. Sec'y of Health & Human Servs., 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity (RFC) for purposes of the analysis required at steps four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere. See 42 U.S.C. § 423(d)(2)(B); Foster v. Bowen, 853 F.2d 483, 490 (6th Cir. 1988).

C.   Plaintiff's Statement of Errors

Plaintiff alleges that the ALJ erred in evaluating the medical evidence when he credited the assessments of two nonexamining agency consultants over those of the examining and treating physicians of record.  Implicit in this argument is the contention that the ALJ failed to gauge properly the severity of plaintiff's pain and fatigue.  Plaintiff further contends that the ALJ failed to give proper consideration to the effects of her obesity, in accord with the requirements of Social Security Ruling (SSR) 02-1p, 2000 WL 628049 (S.S.A. Sept. 12, 2002).  As explained below, the undersigned finds merit in plaintiff's arguments as they relate to her fatigue, and concludes that further administrative consideration of that fatigue and its impact on her functional ability is in order.

Plaintiff argues that her treating physician, Dr.

18

Buchanan, and the government consultant, Dr. Johnson, agreed that her impairments and resulting symptoms would preclude the performance of regular and continuing work, i.e., eight hours per day, five days per week.  Dr. Buchanan's opinion is expressed on a "Fibromyalgia Residual Functional Capacity Questionnaire" (Tr. 297-300) which, as the ALJ aptly noted, is not particularly useful in the determination of plaintiff's residual functional capacity since it speaks only to plaintiff's symptoms, without providing any assessment of her resulting functional limitations. Nevertheless, Dr. Buchanan's responses on the questionnaire identify plaintiff's low back pain as an impairment in addition to her fibromyalgia; describe her symptoms as including multiple tender points, nonrestorative sleep, chronic fatigue, morning stiffness, muscle weakness, and depression; describe her pain as frequent and severe; and express the opinion that her pain or other symptoms are severe enough to interfere constantly with the attention and concentration necessary to perform simple work tasks during a normal workday.  (Tr. 297-98)

Likewise, Dr. Johnson's consultative examination of plaintiff yielded findings of low back pain and poor range of motion in the back due to a combination of arthritic changes, degenerative disc disease, and fibromyalgia; severe fibromyalgia which was evidenced by multiple trigger points in addition to plaintiff's subjective complaints of "diffuse myalgias,

19

arthralgias, and severe fatigue," and which Dr. Johnson deemed "more significant than her trigger points indicate"; restless leg syndrome partially controlled by medication, which was aggravating her fatigue; and, a history of depression and panic attacks. (Tr. 166-71)

While the undersigned finds that the ALJ adequately dealt with the subject of plaintiff's pain (noting that she had not reported the presence of debilitating pain to Dr. Buchanan or any of her physicians, but had in fact reported that Neurontin was effective in partially relieving her pain, and that the clinical evidence did not suggest the existence of functional limitations resulting from debilitating pain (Tr. 18)),[3] the same cannot be said for his treatment of plaintiff's problems with fatigue. The ALJ's treatment of this subjective complaint is limited to the following sentence of his decision: "Although the claimant alleged that she had fatigue at a disabling level, in March 2004, cardiologist Dr. Ong indicated that the claimant had only occasional fatigue." (Tr. 16) The government in its brief also offers only this note by Dr. Ong as supporting the rejection of plaintiff's subjective complaint of severe fatigue. (Docket

_____

[3]The ALJ further noted plaintiff's testimony that "for pain relief she stood and sat a lot." (Tr. 18, 307) While the ALJ did not credit the alleged need for a sit/stand option in his determination of plaintiff's RFC (Tr. 19, 21), he did confirm with the vocational expert that such a need would not preclude the performance of work otherwise available to a person with that RFC; the VE testified that the light job of office helper and the sedentary jobs of table worker and assembler would be compatible with the need for a sit/stand option (Tr. 317).

20

Entry No. 21 at 13, 17)  While it is true that Dr. Ong noted that plaintiff was " + for occasional fatigue" in his first consultative visit with her for evaluation of chest pain (Tr. 197), his subsequent office visits with her in June and December 2004 did not include the word "occasional" when describing her fatigue.  (Tr. 284, 286)  In addition to placing undue emphasis on the isolated report of only occasional fatigue, the government is simply wrong in contending that the record is devoid of evidence supporting plaintiff's contention that her fatigue is moderately severe to severe, as explained below.

It is well established that fatigue is among the symptoms of fibromyalgia, a syndrome which is confounding to the most common and reliable diagnostic techniques and difficult for physicians and adjudicators to quantify in terms of symptom severity.  See generally Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 243-45 (6th Cir. 2007)(discussing fibromyalgia generally and in the context of disability jurisprudence).  Plaintiff's fibromyalgia diagnosis is well documented in the records of her treating internist and neurologist, a consulting rheumatologist, and the government consultant, and is supported by clinical findings by those physicians of telltale trigger points and other symptoms, including chronic fatigue (e.g., Tr. 155, 159, 169). While plaintiff gets some limited relief from her fibromyalgia symptoms by taking Neurontin and other medications (Tr. 306), and

21

although the lone rheumatology consultation documented in the record (Tr. 158-60) does not particularly illuminate the severity of her symptoms, it is undisputed that plaintiff continues to suffer from a certain amount of fatigue attributable to her fibromyalgia, which at least one physician -- the government consultant -- believed to be "severe fatigue" contributing to a condition "more significant than her trigger points indicate." (Tr. 170) It was also acknowledged by Dr. Chung, a neurologist, that unfortunately there is not a particularly good treatment option for fibromyalgia (Tr. 150).

In addition to fibromyalgia, the record reveals that plaintiff also suffers from restless leg syndrome (RLS) and probable periodic limb movement during sleep (PLMS),[4] depression, and obesity, all of which appear to contribute to her alleged

[4]According to research by the National Institutes of Health,

Restless Legs Syndrome (RLS) is a sensorimotor disorder characterized by periodic irresistible urges to move the legs, usually associated with unpleasant and uncomfortable sensations in the legs. These symptoms occur during wakefulness, but are exacerbated or engendered by rest/inactivity and partially relieved by movement. The diurnal pattern of symptoms likely reflects modulations by the circadian system. RLS is reported to profoundly disturb sleep, yet the extent of nocturnal sleep disturbance and of daytime sleepiness has not been established....

About 85-90% of patients with RLS also exhibit periodic limb movements (PLMs) during sleep. Unlike RLS, which is diagnosed on the basis of history and symptoms, periodic limb movement disorder (PLMD) relies upon quantification of repetitive stereotypic leg movements associated with a brief arousal during sleep monitoring. Patients manifesting PLMD have complaints of daytime fatigue and sleepiness or insomnia.... Both disorders have profound negative impact on quality of life including daytime functioning, work performance, and social and family life.

http://www.nhlbi.nih.gov/health/prof/sleep/res_plan/section5/section5d.html.

22

excessive fatigue.  Though by late 2003 plaintiff had achieved good control of her RLS symptoms with an increased dosage of the anticonvulsant medication Neurontin (Tr. 159, 281-82), her neurologist recognized that the fragmented sleep and resulting daytime fatigue she was experiencing despite the control of her RLS was likely attributable to her probable PLMS and depression. He further noted that more complete evaluation of her PLMS would be advisable if excessive daytime fatigue persisted after control of her depression was achieved (Tr. 282).  The ALJ found plaintiff's RLS to be a severe impairment, though, notably, it was found to be not even medically determinable by the non-examining consultants whose concurring RFC assessments the ALJ essentially adopted (Tr. 191, 272); neither the consultants nor the ALJ considered the documentation of plaintiff's continuing struggle with fragmented sleep despite the medical control of her RLS (Tr. 158, 163, 281).

Finally, SSR 02-1p makes clear that obesity must be considered in the analysis of fatigue and related functional disturbances.  The ruling makes particular note of the relationship between obesity and sleep apnea, observing that the resulting drowsiness and lack of mental clarity during the day are subtle effects that may seriously impact functional ability. The ruling further notes that obesity may cause or contribute to mental impairments such as depression, and may cause fatigue

23

affecting the individual's physical and mental ability to sustain work activity, regardless of whether or not the individual also has sleep apnea.  2000 WL 628049 at *3, 6 (S.S.A. Sept. 12, 2002).

Given this confluence of conditions contributing to plaintiff's alleged problems with fatigue, as well as the concurrence of the consultative examiner and Dr. Buchanan that plaintiff's symptoms were severe (severe enough to interfere constantly with attention and concentration, in Dr. Buchanan's view), the undersigned must conclude that further administrative consideration of plaintiff's fatigue is in order, including consideration of an updated medical record for purposes of plaintiff's SSI application.

## IV.  RECOMMENDATION

In light of the foregoing, the Magistrate Judge recommends that plaintiff's motion for judgment on the administrative record be GRANTED, and that the decision of the Commissioner be REVERSED and the cause REMANDED for further administrative proceedings consistent with this report, to include rehearing.

Any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court.  Any party opposing said objections

24

shall have ten (10) days from receipt of any objections filed in which to file any responses to said objections.  Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation.  Thomas v. Arn, 474 U.S. 140 (1985); Cowherd v. Million, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).

      **ENTERED** this 9th day of January, 2008.


                    s/ John S. Bryant
                    JOHN S. BRYANT
                    UNITED STATES MAGISTRATE JUDGE

Case 2:06-cv-00048   Document 22   Filed 01/09/08   Page 25 of 25 PageID #: 87